UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JAMES HARRIS,                :
        Plaintiff,           :
                                :
        v.                    :      C.A. No. 16-080S
                                :
ASHBEL T. WALL,           :
        Defendant.        :

### REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

*Pro se*[1] Plaintiff James Harris, a prisoner at the Adult Correctional Institutions ("ACI")

and a self-identified devout Sunni Muslim, has sued Defendant A.T. Wall individually and in his

official capacity as the Director of the Rhode Island Department of Corrections ("RIDOC")[2]

pursuant to the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1

("RLUIPA").[3]  Plaintiff challenges a longstanding RIDOC policy (the "headwear policy") that

---

[1] As required in this Circuit, based on Plaintiff's *pro se* status, his filings have been liberally construed.  Hughes v. Rowe, 449 U.S. 5, 9 (1980); Haines v. Kerner, 404 U.S. 519, 520-21 (1972) (per curiam); Instituto de Educacion Universal Corp. v. U.S. Dep't of Educ., 209 F.3d 18, 23 (1st Cir. 2000).

[2] Because Director Wall is named in his official capacity, Plaintiff has named the proper defendant for purposes of injunctive relief under RLUIPA.  See Kuperman v. Wrenn, 645 F.3d 69, 79 (1st Cir. 2011).  While RIDOC has not moved to dismiss the suit against Director Wall in his individual capacity, it has argued that no injunction should issue as to him in his personal capacity because such a claim is not viable under RLUIPA, citing Jihad v. Fabian, No. CIV. 09-1604 SRN LIB, 2011 WL 1641885, at *8 (D. Minn. Feb. 17, 2011), adopted, 2011 WL 1641767 (D. Minn. May 2, 2011).  I agree.  Accordingly, I recommend that the motions should be denied as to Director Wall individually because the RLUIPA claim against him personally is not viable.  See Kuperman, 645 F.3d at 79 (noting that Fifth, Seventh and Eleventh Circuits have held that personal-capacity claims are not available under RLUIPA but reserving decision because RLUIPA claim fails as matter of law).  The term "RIDOC" as used in this report and recommendation refers only to Director Wall in his official capacity.

[3] In addition to RLUIPA, Plaintiff's complaint states that it is a "civil action authorized by 42 U.S.C. § 1983 . . . under color of state law, of rights secured by the constitution and acts of congress of the United States."  ECF No. 1 ¶ 1. ("Compl.").  In a subsequent filing and at the hearing, Plaintiff clarified that he is asserting only a claim for declaratory and injunctive relief to redress the RLUIPA violation. ECF No. 16 at 8 ¶ 18 ("Plaintiff has only specifically raised an RLUIPA claim and not a First Amendment Claim.").  Accordingly, this report and recommendation does not address whether Plaintiff's motions would fare differently if the Court were considering a First Amendment claim.  Cf. Staples v. Gerry, Civil No. 14-cv-473-JL, 2015 U.S. Dist. LEXIS 86629, at *47-48 (D.N.H. May 11, 2015) (court declines to issue decision on First Amendment claim; to do so would be essentially

permits him to wear his religious head covering (the kufi[4]) only while he is in his cell or attending religious services.  In this suit, he seeks declaratory relief and a permanent injunction "to ensure that he is allowed to freely exercise the right to exercise the religious belief of wearing a kufi through the ACI facilities without restriction."  ECF No. 3 at 1.  Plaintiff claims that RIDOC's headwear policy imposes a substantial burden on his sincerely-held religious belief and that, while the policy may advance RIDOC's compelling interests in safety and security, it is not the least restrictive means of furthering those interests, as required by RLUIPA.  RIDOC counters with two affidavits, one from Deputy Warden Jeffrey Aceto and the other from Lieutenant William Galligan, which detail the State's compelling penological interests in adopting and enforcing the headwear policy, while attempting to accommodate the religious beliefs of inmates like Plaintiff.

Before the Court for report and recommendation, 28 U.S.C. § 636(b)(1)(B), are Plaintiff's motions for temporary restraining order and preliminary injunction; a hearing on the motions was conducted on July 1, 2016.  Also pending is Plaintiff's oral motion for appointment of counsel, which has been referred for determination.  See 28 U.S.C. § 636(b)(1)(A).  For the reasons that follow, I recommend that the Plaintiff's motions for a temporary restraining order and preliminary injunction be granted in part by the issuance of a limited injunction directing RIDOC to expand its headwear policy to permit Plaintiff to wear a kufi of a specified design while exercising in the prison yard, subject to all of the existing limits on the wearing of secular head coverings.  I further recommend that this slightly more-liberal policy be subject to

---

advisory because RLUIPA is more protective of prisoner's religious practice), adopted with modifications sub nom., Staples v. N.H. State Prison, Warden, Civil No. 14-cv-473-LM, 2015 WL 4067139 (D.N.H. July 2, 2015).

[4] "A Kufi is a 'close-fitting brimless cylindrical or round hat.'"  Malik v. Ozmint, Civil Action No. 8:07-387-RBH-BHH, 2008 WL 701517, at *9 (D.S.C. Feb. 13, 2008) (quoting Merriam-Webster's Dictionary, http://www.merriam-webster.com/dictionary/kufi)), adopted, 2008 WL 701394 (D.S.C. Mar. 13, 2008), aff'd, 289 F. App'x 662 (4th Cir. 2008).

immediate cancellation and withdrawal of the privilege if, in practice, it exacerbates RIDOC's

identified security concerns.  Beyond this narrow injunction, I recommend that Plaintiff's

motions for a temporary restraining order and preliminary injunction be denied.  In a separate

memorandum and order, I have also denied the motion for counsel, subject to Plaintiff's right to

renew the motion if this matter proceeds to the discovery phase, and subject to the acceptance of

the case by a member of the Court's *pro bono* panel.

## I.    FACTS[5]

### A.    RIDOC's Policies and Compelling Penological Interest

The RIDOC policies at issue in this case exist to protect the well-being and security of

correctional staff, inmates and the public.  Aceto Aff. ¶ 61.  These policies were not adopted in a

vacuum: during the 1970s, violence and other conditions at the ACI resulted in the judicial

holding that it was an institution "unfit for human habitation and shocking to the conscience of a

reasonably civilized person," Palmigiano v. Garrahy, 443 F. Supp. 956, 979 (D.R.I. 1977), while

in the 1990s, gang activity continued to be a significant security concern.  Galligan Aff. ¶ 18.

RIDOC remains vigilant in seeking ways to reduce gang and sectarian violence at the ACI by

eliminating, to the greatest degree possible, any differentiating factor in the inmate population

that might be used as a gang identifier or that might serve as a basis for groups of inmates to

segregate themselves from other inmates.  Galligan Aff. ¶¶ 18-19; see Aceto Aff. ¶¶ 51-54

(permitting subgroups in prison to create "us vs. them" mentality is extremely dangerous and

poses a direct threat to prison order and security).

---

[5] These facts are drawn from the verified complaint, declarations, affidavits and other evidence that Plaintiff and RIDOC submitted.  Plaintiff's verified complaint (ECF No. 1) is referred to as "Compl.," while Plaintiff's declarations are referred to as "Pl. Dec. I" (ECF No. 3-1) and "Pl. Dec. II" (ECF No. 18).  The parties' document submissions are referred to by ECF number.  During the hearing, Plaintiff made representations about the motions, his Muslim faith and status at the ACI, which are referenced in the text.  In support of its opposition to the motions, Defendant proffered affidavits from two RIDOC officials, Lieutenant William Galligan, whose affidavit is at ECF No. 14-1 and will be referred to as "Galligan Aff.," and Deputy Warden Jeffrey Aceto, whose affidavit is at ECF No. 14-2 and will be referred to as "Aceto Aff."

As the Galligan and Aceto affidavits make clear, in formulating its policies, RIDOC strives to anticipate what might increase the risk of violence or danger and has created a complex weave of policies to address the identified risks.  For example, it monitors the experiences of other institutions; as a result, it knows that hats are readily used in a wide range of ways by members of gangs, such as the Aryan Brotherhood, to self-identity to other inmates.  Aceto Aff. ¶ 33; see id. ¶ 35 (RIDOC believes that wearing the kufi in certain manner or only on certain days could be used to signal gang affiliation).  Similarly, RIDOC staff is aware that the potential for factional violence inside the institution is exacerbated when racial or religious tensions erupt in the society outside the institution.  This information is used to design policies to reduce gang, religious or racial violence to the greatest degree possible.  Aceto Aff. ¶ 38 (news stories about religious tensions will manifest tenfold in prison population); id. ¶¶ 40-42 (noting that tensions were created when pork was eliminated from RIDOC menu to accommodate Muslim inmates). RIDOC also knows that even a perception of preferential treatment can trigger a potentially violent outburst, threatening the ability of RIDOC staff to maintain order.  Aceto Aff. ¶¶ 40-44 (describing profane outburst by inmate who believed, wrongly, that fish was being served to accommodate Muslim inmates).  Based on its past experience with sectarian violence, as well as information gained from the experiences of other institutions, RIDOC believes that there is a "very real" danger that permitting the wearing of the kufi (and other religious head coverings) throughout the ACI could facilitate gang activity or promote the identification of a subgroup as a distinct clique, creating the "risk of boiling over into factional violence."  Aceto Aff. ¶¶ 35, 37-38.

A second serious danger that RIDOC must constantly address is the smuggling of contraband, particularly drugs, weapons, notes and food, into the ACI and from place to place

within the institution.  Galligan Aff. ¶ 15.  RIDOC takes "proactive measures to stem the tide of this destructive practice," while acknowledging that is it virtually impossible entirely to eliminate contraband trafficking from any prison.  Aceto Aff. ¶¶ 5, 9; see Galligan Aff. ¶ 15.  Based on experience, RIDOC is aware that contraband is smuggled into the institution through a wide range of creative methods, including in sneakers, under hats, in sock bands, in body orifices and in the seams of clothing.  Galligan Aff. ¶ 16.  RIDOC has also observed that clothing can be switched, for example during family visits, to smuggle contraband.  Aceto Aff. ¶¶ 7-9.

To prevent contraband smuggling RIDOC conducts frequent inmate searches.  Aceto Aff. ¶ 9.  However, while RIDOC relies on both random and key-time searches, its resources are finite and at some point extensive searches become impracticable without a significant reallocation of resources.  Aceto Aff. ¶ 9; see id. ¶ 18 (due to infeasibility of searching inmates constantly, inmates moving within ACI are searched either randomly or not at all).  In addition, RIDOC's knowledge of the dangers of singling out a discrete group has caused it to conclude that religious tensions, and the related potential for violence, would increase if believers are targeted for searches.  See Aceto Aff. ¶¶ 19-21 (if religious head coverings, such as the kufi, are permitted throughout ACI, additional searches would increase costs, add to burden on RIDOC staff, complicate searching, increase religious tension and detract from searches of other inmates).  Based on these considerations, RIDOC believes that permitting the wearing of the kufi or other religious head coverings without limitation would tax its limited resources, undermine its strict uniform policy and hinder its ability to combat contraband smuggling.  Aceto Aff. ¶ 21.

A third RIDOC concern is the maintenance of prison order, which requires the swift and efficient conduct of searches, as well as monitoring by correctional officers and security cameras.  Aceto Aff. ¶ 17.  RIDOC believes that any head covering, including a kufi, would

hinder inmate identification because identifying features can be obscured both from correctional officers and cameras, making it more difficult to track movements or determine an inmate's identity.  Aceto Aff. ¶¶ 27-29.  In addition, the proliferation of head coverings would make the search protocol more complex and increase the likelihood that something dangerous could be overlooked.  See Aceto Aff. ¶¶ 11, 13, 17.

To address these serious safety concerns while minimizing the need for additional searches (and the costs and tensions such searches would cause), RIDOC has implemented interconnected policies,[6] including specially-designed prison uniforms and aggressive restrictions on the ability of inmates to wear any article of clothing or adornment that is different or unnecessary.  Aceto Aff. ¶¶ 10, 58-59; Galligan Aff. ¶¶ 17-19.  RIDOC strives to achieve a complete uniformity which will facilitate searches and inmate identification, and which will eliminate anything that could be used to hide contraband or to signal gang or other affiliation.  For example, the special uniform has eliminated pockets[7] because they were not only used to hide contraband but were also adjusted to signal gang affiliation.  Aceto Aff. ¶ 12; see Galligan Aff. ¶ 18 (RIDOC eliminated belts because they were used to signal gang affiliation).

A critical strand woven into the fabric of these interconnected policies is RIDOC's strict prohibition against inmates wearing any head covering – religious or otherwise – anywhere inside any RIDOC facility or outside in the prison yard.  Galligan Aff. ¶ 11; Aceto Aff. ¶¶ 11, 25.  The only exception is that inmates may wear a uniform knit cap in winter and a uniform baseball cap in summer while they are outside in the prison yard.  Because of security concerns,

---

[6] For example, RIDOC's experiences with the real and extremely serious risks created when inmates are permitted to form subgroups or cliques have resulted in the implementation of policies keeping cell blocks and prison jobs integrated so that they are not dominated by inmates of one race or religion.  Aceto Aff. ¶ 39.  The same concerns have resulted in a policy requiring that religious jewelry (such as a religious symbol worn around the neck) be concealed under the clothing so that it cannot be seen by other inmates.  Aceto Aff. ¶ 48.

[7] Plaintiff disputes part of this averment, pointing out that the uniform shirt has pockets.  Pl. Dec. II ¶ 16.

inmates must carry the cap until they are outside and remove it immediately upon reentering the facility.[8]  Aceto Aff. ¶¶ 23-24, 26.

RIDOC's affiants aver that these policies have been very successful.  The amount of searching has been reduced, permitting more productive deployment of resources.  And the gang violence of the 1990s has been brought under control "due to steps DOC took to reduce gang activity, such as implementing standard prison uniforms."  Galligan Aff. ¶ 19.  As Lieutenant Galligan noted, "[a]s a result, DOC facilities are now one of the best in the country at reducing and managing gang activity."  Id.  Plaintiff disputes the efficaciousness of the policies, averring that, despite the ban on religious head coverings, contraband is easily smuggled; gang activity is "very present and current," resulting in a fight as recently as January 2016; inmates' hair can be styled in braids or ponytails to smuggle contraband and signal gangs; the secular caps permitted during exercise are tilted as gang signals; and Muslims are readily identified because of their dietary differences.  Pl. Dec. II ¶¶ 11, 13, 26, 28; see id. ¶ 14.

To accommodate the religious beliefs of inmates whose religion calls for the wearing of a head covering, while not compromising the safety and security of inmates, staff and the public, RIDOC has relaxed the headwear policy in limited circumstances.  See Galligan Aff. ¶ 11; Aceto Aff. ¶ 11.  Specifically, all inmates whose beliefs call for head coverings, no matter the religious affiliation, are allowed to wear religious headwear in their cells and during religious services.  See Galligan Aff. ¶ 11; Compl. ¶ 17; Pl. Dec. II ¶ 23.  However, when mingling with the rest of the inmate population, moving through the institution, exercising in the yard, researching in the library, working at a job, taking a class, or visiting with family and friends, all inmates must

---

[8] Plaintiff claims that the knit caps are offered in three colors, which he alleges undermines RIDOC's claim of uniformity, while RIDOC avers that the knit cap is black.  Compare Pl. Dec. II ¶ 20, with Aceto Aff. ¶ 23.  Plaintiff also alleges that it is easier to hide contraband in a carried cap than in a worn cap so that the policy of requiring that the caps must be carried, not worn, to the prison yard is counterintuitive.  Pl. Dec. II ¶ 21.

conform to the basic policy of wearing the specially-designed uniform with no head covering and no other visible apparel or adornment, except to the limited extent that a cap is necessary for protection from the cold or the sun while exercising outdoors.

### B.    Plaintiff's Religious Beliefs

Plaintiff has been an inmate at the ACI since March 23, 2006.  Galligan Aff. ¶ 5.  In 2005, a year prior to the commencement of his sentence, Plaintiff converted to Islam.  Three years later, in 2008 (while serving his current sentence), he began wearing a kufi.  At the hearing, Plaintiff stated that the ACI's policy limiting the wearing of the kufi (and other religious headwear) was in place when he first chose to wear it.  Consequently, over the last eight years, Plaintiff has worn his kufi only in his cell and at religious services.  See Pl. Dec. I ¶ 7; Galligan Aff. ¶ 11; Aceto Aff. ¶ 11.

In his declarations and filings, as well as in his statements made during the hearing, Plaintiff explains that he wears the kufi based on his belief as a Sunni Muslim that he must follow the Islamic dress code as expressed in the "hadiths," or sayings of the prophet Muhammad, which require that men wear a turban or kufi to express respect and deference to Allah.  Compl. ¶¶ 7, 9, 14-15; ECF No. 8-1 at 3, 9, 11.  Plaintiff believes that wearing a kufi at all times[9] is an important act of worship that allows a Muslim to "earn blessings" and "become beloved to Allah."  Compl. ¶ 19; Pl. Dec. I ¶¶ 4-5.  His belief includes the conviction that wearing a kufi is akin to automatic worship and that, if he dies without his kufi, he would be at

---

[9] Lieutenant Galligan controverts Plaintiff's professed need to wear a kufi at all times in his affidavit with the testimony that he has seen Plaintiff in his cell without his kufi "[o]n multiple occasions."  Galligan Aff. ¶ 13. Plaintiff responds that he does not wear the kufi while shaving, applying hygiene products or sleeping.  Pl. Dec. II ¶ 9.  The Galligan affidavit also avers that Plaintiff's block officer has said that Plaintiff does not wear his kufi roughly thirty percent of the time when in his cell.  Galligan Aff. ¶ 14.  Plaintiff disputes the accuracy of the hearsay from the block officer, asserting that he (Plaintiff) spoke to his block officer, who said that his words had been twisted because the block officer rarely sees Plaintiff in his cell without a kufi, and the reference to "30% of the time" included times when Plaintiff was not in his cell.  Pl. Dec. II ¶ 10.  With no affidavit from the block officer to counter Plaintiff's averment, I have disregarded the hearsay and accept for purposes of these motions Plaintiff's claim that he wears his kufi in his cell as much as he can.

risk of "being raised up among [non-believers] on the day of Judgement."  Pl. Dec. I ¶ 3.  This

belief is so powerful, Plaintiff alleges, that the RIDOC headwear policy has forced him to choose

between following his religion or taking part in prison recreation and other activities out of his

cell.  Based on his belief, at times, Plaintiff has stayed in his cell and foregone recreation in the

yard or other activities; however, after many weeks he began to suffer severe anxiety from the

lack of exercise and fresh air.  Pl. Dec. I ¶¶ 6, 7.

Plaintiff attributes the delay between the time when he began wearing a kufi at the ACI in

2008, and September 29, 2015,[10] when he first took steps to challenge the ACI's policy on

religious headwear, to his understanding that "… I thought, as an inmate, I give up and lose all

rights upon incarceration."  Pl. Dec. II ¶ 4.

### C.    Plaintiff's Other Relevant Background

Plaintiff's current sentence is twenty years, with sixteen years to serve, for felony assault,

conspiracy, carrying a pistol without a license, discharging a firearm and firing in a compact

area.  In public filings earlier this year in connection with a Superior Court matter,[11] RIDOC

asserts that he has had twenty-two disciplinary infractions since entering the ACI in 2006.  Harris

v. Rhode Island, No. PP-2016-0520 (R.I. Super. Ct. June 3, 2016).  In December 2014, he

received a disciplinary booking for narcotics trafficking when a visiting friend was found to have

narcotics on her person.  Plaintiff received a sanction of 365 days in segregation, 365 days of lost

---

[10] On September 29, 2015, Plaintiff submitted a Level I grievance in which he asked to wear his kufi throughout the ACI without restriction. Compl. Ex. A (ECF No. 1-3).  After denial, on November 4, 2015, Plaintiff filed a Level II grievance.  It was denied on November 30, 2015.  Compl. ¶¶ 28-30.  Presumably in light of this history, RIDOC has not challenged Plaintiff's RLUIPA claim based on the failure to exhaust available administrative remedies.  See Collins v. Hobbs, No. 5:13CV00060-SWW-JTK, 2014 WL 2084875, at *2 (E.D. Ark. May 19, 2014) (granting prison official's motion for summary judgment on RLUIPA claim challenging, inter alia, policy limiting when kufi can be worn based on failure fully to exhaust available grievance procedure).

[11] Plaintiff filed a Superior Court petition to change his birth name to a Muslim name.  Pl. Dec. II ¶ 32.  Following briefing and a hearing, the petition was denied on security grounds based on RIDOC's uncontroverted evidence that Plaintiff's criminal record has twenty-one criminal entries, he is subject to a no-contact order extending to 2026 and he has had twenty-two disciplinary infractions since entering the ACI in 2006.  Harris v. Rhode Island, No. PP-2016-0520 (R.I. Super. Ct. June 3, 2016); see Pl. Dec. II ¶ 32.

good time, and 365 days of lost visitation.[12]  Harris v. Perry, No. CA 15-222-ML, 2015 WL

4879042, at *1-2 (D.R.I. July 15, 2015); Aceto Aff. ¶ 22.  Since February 2015, Plaintiff has

been in High Security Administrative Confinement for this attempt to smuggle contraband.

Galligan Aff. ¶ 6.  Plaintiff concedes that he has been affiliated with a gang at the ACI in the

past, although he asserts that he is no longer actively involved with gangs.  Aceto Aff. ¶ 36; Pl.

Dec. II ¶ 24.  Finally, he avers that all inmates already know that he is a Muslim and that his

beliefs teach that he is "better" than non-Muslim inmates and RIDOC staff, which already

creates the "us vs. them" mentality within the ACI.  Pl. Dec II ¶ 29.  Consistent with this theme,

Plaintiff attached to his complaint a letter expressing his belief, *inter alia*, that he must wear the

kufi as an expression of his membership in a "tribe, nation, and religion in ALLAH's Kingdom,"

analogous to an army uniform.  Compl. Ex. C (ECF No. 1-5 at 2).

　　Because of his high security status, Plaintiff currently spends nineteen to twenty-one

hours a day in his cell and is not allowed to attend religious services.  At the hearing, he admitted

that these restrictions significantly limit the impact of the headwear policy.  Galligan Aff. ¶¶ 8,

11.  Presently, he is allowed out of his cell for one hour of outside recreation five days a week, a

ten minute phone call once a week, one hour of programming two to three times a week, and two

to three hours six times a week to work as a porter.  Galligan Aff. ¶¶ 9-10.  During the hearing,

Plaintiff added the three to four hours per week that he spends in the law library; he also stated

that, if permitted to do so, he would prefer to wear his kufi while exercising in the prison yard,

but would accept a ban on wearing the kufi during classes and visits from friends and family.

---

[12] After this Court rejected his § 1983 claim challenging the severity of the consequence imposed for this infraction, Harris v. Perry, No. CA 15-222-ML, 2015 WL 4879042, at *2 (D.R.I. July 15, 2015), Plaintiff filed a second action, which alleges that the procedures used to adjudicate the narcotics booking violated his due process rights; this case remains pending.  Harris v. Perry, No. 16-cv-0089M (D.R.I. Feb. 24, 2016); see Pl. Dec. II ¶ 19 (claiming narcotics trafficking was a false booking).

At the hearing, the parties confirmed that Plaintiff's current status at the ACI may change in the near future.  First, Plaintiff's security risk group level was recently lowered because he is no longer actively involved with a gang.  Pl. Dec. II ¶ 24.  Based on this determination, Plaintiff stated (and RIDOC did not disagree) that he expects soon to be permitted to leave his cell for a greater portion of each day, which would result in the headwear policy imposing an increased burden on the practice of his religious faith.  Second, Plaintiff will be eligible for parole in September 2016; therefore, it is possible he will be released from the ACI, potentially mooting his prayer for injunctive relief.[13]  Kuperman v. Wrenn, 645 F.3d 69, 72-73 (1st Cir. 2011) (RLUIPA claims for injunctive relief are moot due to claimant's release from state custody while appeal was pending); Hathcock v. Cohen, 287 Fed. App'x 793, 799 (11th Cir. 2008) (transfer of plaintiff to another facility moots RLUIPA claim arising from limits on when kufi may be worn).

## II.    STANDARD OF REVIEW

When considering a request for interim injunctive relief, the court must be guided by the traditional equity doctrine that preliminary injunctive relief is an extraordinary and drastic remedy that is never awarded as of right.  Letourneau v. Aul, No. CA 14-421L, 2015 WL 5167854, at *2 (D.R.I. Sept. 3, 2015).  The basic four-factor legal standard is the same for a temporary restraining order and a preliminary injunction.[14]  OfficeMax Inc. v. Cty. Qwick Print, Inc., 709 F. Supp. 2d 100, 106 (D. Me. 2010); Brennan v. Wall, C.A. No. 08-419S, 2009 WL

---

[13] Plaintiff disputes that his release will moot his claim, arguing that his parole could be revoked, which would bring him back to the ACI, and reassert the burden on his religious beliefs imposed by the headwear policy.

[14] The principal distinction between a temporary restraining order and a preliminary injunction is that a temporary restraining order can be issued quickly at the outset of the litigation without notice to the opposing party, or when a litigant is facing a threat of irreparable harm before a preliminary injunction can be held.  Compare Fed. R. Civ. P. 65(a)(1) (preliminary injunction can issue "only on notice to the adverse party"), with Fed. R. Civ. P. 65(b) (temporary restraining order can issue with or without notice to opposing party).  When, as here, the opposing party has notice, the opportunity to respond, and an adversarial hearing is held, the standards for issuing a temporary restraining order are substantively similar to those for a preliminary injunction.  San Juan Cable LLC v. Telecommunications Regulatory Bd. of Puerto Rico, 598 F. Supp. 2d 233, 235 (D.P.R. 2009).

196204, at *2 (D.R.I. Jan. 26, 2009).  That is, the moving party must demonstrate: (1) a substantial likelihood of success on the merits; (2) a significant risk of irreparable harm if the injunction is withheld; (3) a favorable balance of hardships; and (4) a fit (or lack of friction) between the injunction and the public interest.  Nieves–Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003) (preliminary injunction); Brennan, 2009 WL 196204, at *2  (temporary restraining order).  A plaintiff seeking an interim injunction bears the burden of demonstrating that each of the four factors weigh in his favor.  Letourneau v. Aul, No., 2015 WL 5167854, at *2.

The four factors are not weighted equally; "likelihood of success is the main bearing wall of this framework" and of primary importance.  W Holding Co. v. AIG Ins. Co.-Puerto Rico, 748 F.3d 377, 383 (1st Cir. 2014); Flores v. Wall, No. CA 11-69 M, 2012 WL 4471103, at *3 (D.R.I. Sept. 5, 2012); see Letourneau, 2015 WL 5167854, at *2.  "[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."  Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).  Irreparable harm is measured on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown."  Braintree Labs., Inc. v. Citigroup Glob. Markets Inc., 622 F.3d 36, 42-43 (1st Cir. 2010).

Interim injunctive relief is typically used to "preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs."  Letourneau , 2015 WL 5167854, at *2.  By contrast, an injunction that alters the status quo, which is what Plaintiff is seeking, is atypical.  Designated as a "mandatory injunction," such relief "normally should be granted only in those circumstances

when the exigencies of the situation demand such relief." Braintree Labs., 622 F.3d at 4;

Textron Fin. Corp. v. Freeman, No. CA 09–087S, 2010 WL 5778756, at *2 (D.R.I. Oct. 28,

2010).  Put differently, because a mandatory preliminary injunction alters rather than preserves

the status quo, such an injunction should not issue unless the facts and the law clearly favor the

moving party.  Robinson v. Wall, No. C.A. 09-277-S, 2013 WL 4039027, at *2 (D.R.I. Aug. 7,

2013); see Flores v. Wall, 2012 WL 4471103, at *7 (when injunction sought is mandatory, courts

should exercise more caution); Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 66 F. Supp. 2d

317, 327 (D.R.I. 1999) (same).

 Plaintiff's status as a prisoner triggers an additional restriction on the availability of

interim injunctive relief that is set forth in the Prison Litigation Reform Act ("PLRA").  18

U.S.C. § 3626.  PLRA provides that the court shall not enter a temporary restraining order or

preliminary injunction unless it finds that the injunctive relief is "narrowly drawn, extend[s] no

further than necessary to correct the harm the court finds requires preliminary relief, and [is] the

least intrusive means necessary to correct that harm."  18 U.S.C. § 3626(a)(2).  Further, the court

considering an interim injunction "shall give substantial weight to any adverse impact on public

safety or the operation of a criminal justice system caused by the preliminary relief."  In addition,

the court must respect principles of state and federal comity.  18 U.S.C. § 3626(a)(2).  In

interpreting the text of § 3626, courts must be guided by Congress's "ambient intent" to curb the

involvement of the federal judiciary in the day-to-day management of prisons.  Morales

Feliciano v. Rullan, 378 F.3d 42, 50 (1st Cir. 2004).  Under the PLRA, preliminary injunctive

relief automatically expires after ninety days unless the court makes specific findings supporting

an extension.  See 18 U.S.C. § 3626(a)(1)-(2).

## III. ANALYSIS

This case implicates two competing but important matters of public concern; it juxtaposes the interest in the security and safety of prisons against the important interest in the protection of religious practice from governmental interference codified in RLUIPA.  To set the balance right, the Court must be guided by the Supreme Court's seminal RLUIPA decision, Holt v. Hobbs, __ U.S. __, 135 S. Ct. 853 (2015), in which a grooming regulation banning short beards was struck down because it burdened the prisoner's sincerely-held religious belief that men must grow beards.  Id. at 867.  My recommendation – that the Court deny the broad injunction sought by Plaintiff, but issue the narrow injunction suggested by the body of RLUIPA case law discussed below – is intended to be consistent with the accommodation of both.

A.      **Substantial Likelihood of Success on the Merits**

Under RLUIPA,[15] Plaintiff has the initial burden of proving that his religious beliefs are sincere and that RIDOC has instituted a policy that "substantially burdens his exercise of religion."  Once he satisfies this burden, the burden shifts to RIDOC to show that its policy (1) "is in furtherance of a compelling governmental interest" and (2) "is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a); see LeBaron v. Spencer, 527 Fed. App'x 25, 28-29 (1st Cir. 2013) (per curiam); Ajala v. West, 106 F. Supp. 3d 976, 980 (W.D. Wis. 2015).  Because of the "least restrictive means" requirement, the Act affords greater protection for religious exercise "than what is available under the First Amendment."  Holt, 135 S. Ct at 859-60.

---

[15] RLUIPA states in pertinent part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a)(1) and (2).

14

Plaintiff's averments and other evidence of the religious foundation for his belief easily satisfy his initial burden of establishing that the relief sought in these motions is animated by a sincere religious conviction.  This is not a case where the claimant's religious assertions amount to no more than vague allegations or "conclusory" arguments.  See Al-Fuyudi v. Correction Corp. of America, CIV-12-1170-D, 2016 WL 1117607, at*2 (W.D. Okl. Mar. 22, 2016); Strother v. Myers, No. 1:11cv01131 AWI DLB, 2013 WL 1785978, at *5 (E.D. Cal. Apr. 25, 2013). Facing similar evidence, numerous courts, including some that conducted extensive evidentiary hearings, have acknowledged that the belief that the kufi should be worn at all times can be sincere.  See, e.g., Caruso v. Zenon, No. 95-MK-1578 (BNB), 2005 WL 5957978, at *18 (D. Colo. July 25, 2005) (following bench trial, testimony of competing experts on belief of Muslims of Hanafi school results in finding that wearing of kufi at all times can be sincerely-held religious belief); Malik v. Ozmint, No. 8:07-387-RBH-BHH, 2008 WL 701517, at *11 (D.S.C. Feb. 13, 2008) (affidavits and declarations submitted with summary judgment motion permit finding that plaintiff sustained burden of establishing that wearing kufi at all times is sincerely-held religious belief), adopted, 2008 WL 701394 (D.S.C. Mar. 13, 2008), aff'd, 289 F. App'x 662 (4th Cir. 2008).  Plaintiff's failure to present proof that the kufi is "central" to the Muslim faith is irrelevant.  Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005) (RLUIPA bars inquiry into whether particular belief or practice is central to prisoner's religion, while permitting inquiry into sincerity of professed religiosity).  Accordingly, for purposes of these motions, I find – and RIDOC has not seriously disputed[16] – that it is likely that Plaintiff will successfully demonstrate that his religious belief about the importance of wearing the kufi all the time is sincere.

The second leg of Plaintiff's burden is to demonstrate that the policy forbidding him from wearing his kufi except in his cell and at religious services amounts to a substantial burden on

---

[16] See n.9 supra.

religious exercise.  Plaintiff supports his claim with the uncontroverted averment that he has tried not to leave his cell, eschewing outdoor exercise, to the detriment of his mental health, in an attempt to comply with the religious duty to wear a kufi.  See Holt, 135 S. Ct. at 862 (policy is substantial burden when prisoner faced choice of shaving beard in contravention of religious belief or facing serious prison discipline); Staples v. N.H. State Prison, Warden, Civil No. 14-cv-473-LM, 2015 WL 4067139, at *9 (D.N.H. July 2, 2015) (policy is substantial burden when prisoner faced choice of shaving beard in contravention of religious belief or remaining in harshest level of confinement).  RIDOC counters by pointing to the reality that, because Plaintiff is confined to his cell for almost twenty-four hours per day, the headwear policy has limited impact on him.  However, numerous cases have rejected that argument, holding that when a policy limiting the amount of time a kufi can be worn is imposed on a prisoner who sincerely believes that it should be worn at all times, the burden on religious practice is substantial because it still amounts to an outright ban.  See, e.g., Ajala, 106 F. Supp. 3d at 981 (if belief requires kufi "all the time," rule that allows it "most of the time" imposes a substantial burden); Malik v. Ozmint, 2008 WL 701517, at *9-11 (rejecting prison official's argument that burden of kufi limitation not substantial because inmate out of cell only one hour per day).  Contrary holdings appear to be based on the *sui generis* nature of the inmate's religious belief.  See, e.g., Jihad v. Fabian, No. CIV. 09-1604 SRN LIB, 2011 WL 1641885, at *17 (D. Minn. Feb. 17, 2011) (where prisoner believed only that he needed to cover his head and state-issued headwear was permitted, kufi ban did not amount to substantial burden), adopted, 2011 WL 1641767 (D. Minn. May 2, 2011).  Accordingly, consistent with our Circuit's directive that, when a policy amounts to an outright ban on a religious exercise, "[c]ourts have little difficulty in concluding that . . . [it] is a substantial burden on that . . . exercise," LeBaron, 527 F. App'x at 29, I find that Plaintiff has

demonstrated likelihood of success in establishing that the headwear policy imposes a substantial

burden on his religious practice.

With Plaintiff's RLUIPA burdens satisfied, I turn next to RIDOC, which first must show

that its kufi restriction operates in furtherance of a compelling government interest.  42 U.S.C. §

2000cc-1(a).  Through the affidavits of two highly experienced correctional officials, RIDOC has

established that its headwear policy evolved as part of its response to a Rhode Island-specific

gang problem and that more than mere speculation undergirds its belief that permitting *ad hoc*

religious head coverings worn throughout the entire facility would create the risks of: (1)

increased smuggling of drugs, weapons and other contraband; (2) increased difficulty in the

identification of inmates; (3) increased gang activity; (4) increased religious tensions and

singling out of Muslims; (5) demands for other dress exceptions and the erosion of a prison

uniform; and (6) demands for other headgear leading to religious and gender discrimination.

RIDOC has buttressed its compelling-interest evidence with concrete proof that its rationale

correlates to Plaintiff's criminal background and disciplinary history (including both a

contraband offense and past gang involvement).  See Staples v. N.H. State Prison, 2015 WL

4067139, at *6  (claimant's history of drug offenses and use of a razor to self-harm demonstrates

that institutional interests are not abstract).  In performing this leg of the analysis, courts defer to

the judgment of prison officials and apply RLUIPA "with particular sensitivity to security

concerns."  Cutter v. Wilkinson, 544 U.S. at 722; see Holt, 135 S. Ct. at 864 ("Prison officials

are experts in running prisons and evaluating the likely effects of altering prison rules"); Flores

v. Wall, 2012 WL 4471103, at *6 (while "federal courts must take cognizance of prisoners' valid

constitutional claims, federal courts cannot manage prisons, and must give substantial deference

to those who do").  I find that RIDOC's affidavits constitute persuasive evidence that it will

succeed in meeting its burden of proving that the headwear policy furthers compelling interests in safety and security.

A far more difficult question is presented by the second prong of the burden imposed on RIDOC – whether the headwear policy is the least restrictive way that it can achieve its compelling goal of a safe and secure prison facility.  Holt counsels that this analysis requires scrutiny of the prison's stated security interest in the context of the inmate's circumstances and that courts must not defer blindly to the prison's stated security justification.  135 S. Ct. at 864; see Staples v. N.H. State Prison, 2015 WL 4067139, at *3 ("least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion") (citing Holt, 135 S. Ct. at 864).  As Justice Sotomayor clarified in her Holt concurrence, "least-restrictive-means" is a relative term and RLUIPA does not require that prison officials refute every conceivable option; however, officials must demonstrate that a less restrictive alternative suggested by the prisoner would undermine the prison's compelling interests and they must respond to less restrictive policies used at other prisons brought to their attention during the course of the litigation.  Id. at 868 (citing United States v. Wilgus, 638 F.3d 1274, 1289 (10th Cir.  2011) (in analogous context of Religious Freedom Restoration Act, government need not "do the impossible – refute each and every conceivable alternative regulation scheme" – but should "refute the alternative schemes offered by the challenger")).

Many pre- and post-Holt decisions have found that the prisons seeking to justify protocols similar to RIDOC's headwear policy stumble at this last leg of the analysis.  In each such case, the court concluded that prison officials had failed to present evidence sufficient to meet the exceptionally demanding mark of demonstrating that their policy was the least

restrictive means of protecting the articulated compelling interest.  In every instance, the court noted that the prison barred religious head coverings in circumstances where secular head coverings were permitted.  See Ajala, 106 F. Supp. 3d at  982-87 (prison that allowed secular hats failed to show that allowing kufi would trigger tensions and materially increase searching); Ali v. Stephens, 69 F. Supp. 3d 633, 644-49 (E.D. Tex. 2014) (prison's justifications for kufi ban rejected as speculative "post hoc rationalizations" because it failed to address more lenient policies used by other prison systems and failed to explain why secular hats, which were sometimes permitted, did not cause same concerns); Malik, 2008 WL 701517, at *12  (with unexplained evidence that other inmates were allowed to wear caps, hoods and hats outside of their cells, fact issue existed as to whether kufi ban was least restrictive means to prevent smuggling contraband), adopted, 2008 WL 701394 (D.S.C. Mar. 13, 2008), aff'd, 289 F. App'x 662 (4th Cir. 2008); Aziyz v. Tremble, No. CIV A 5:03CV-412 HL, 2008 WL 282738, at *2, *6 (M.D. Ga. Jan. 31, 2008) (kufi ban plainly not least restrictive alternative to prevent inmates from identifying themselves as gang members because prison later allowed uniform kufi); Caruso v. Zenon, 2005 WL 5957978, at *20 (prison that required stocking cap or baseball cap failed to carry burden of establishing that outright ban on kufi was least restrictive alternative).

Other pre- and post-Holt cases hold that the state's compelling interest in the safety and security of prisoners and staff is so great, and the need to defer to the prison officials' expertise is so compelling, that a policy that places limits on when a Muslim prisoner may wear the kufi "appears to qualify as the least restrictive way of furthering that compelling interest."  Phillips v. Cobb, No. 3:14CV3109, 2016 WL 2726630, at *8 (W.D. La. Apr. 4, 2016) (prison established that head-covering policy banning kufi outside of dorm was least restrictive means of furthering compelling governmental interest); accord, Guess v. McGill, No. 9:13-cv-02260-TLW, 2014 WL

5106735, at *10-12 (D.S.C. Oct. 10. 2014) (prison officials met burden of showing that ban on array of Muslim practices, including inmate-led prayer group, possession of DVDs and religious oils and openly wearing kufi, was least restrictive means of furthering prison interest in security); Garner v. Livingston, No. CA-C-06-218, 2011 WL 2038581, at *3 (S.D. Tex. May 19, 2011) (no-beard policy enjoined, but rule banning kufi at certain times found to be least restrictive way of furthering safety and security); Jihad v. Fabian,  2011 WL 1641885, at *17-18 (ban on kufi outside of cell or religious services narrowly tailored to further prison's compelling interest in safety and security by requiring uniform appearance of all inmates); see also Jonas v. Schriro, No. 04-2719-PHX-SMM, 2006 WL 2772641, at *5 (D. Ariz. Sept. 25, 2006) (ban on native American religious headband, except for recreation and religious services, found to be least restrictive means of furthering compelling interest in safety and security).  However, in almost none of these cases does the decision reflect that the court grappled with evidence juxtaposing a more lenient rule on secular hats than that applied to religious head coverings.  The only exception, Jihad, 2011 WL 1641885, at *17, is based on the finding that the claimant believed only that his religion required him to cover his head, which he could do with readily available state-issued headwear.

Plaintiff points to Ali and argues that "[t]here has never been a past event at the ACI that threatened institutional security or to support the inadequately formulated prison policies and regulations that are grounded on mere speculation, exaggerated fears, or post-hoc rationalizations prohibiting the religious practice of wearing a kufi throughout the ACI."  Compl. ¶ 31.  More concretely and consistent with Holt's holding that prisons must at least consider more flexible policies that seem to work at other institutions, he has proffered evidence of the federal prison policy, which permits the wearing of strictly-defined religious head coverings, including the kufi,

throughout federal institutions.  ECF No. 16-1 at 2; Compl. ¶ 32; see Pl. Dec. II ¶ 33.  Consistent

with Holt's holding that prisons must at least consider the inmate's suggestion of a compromise

that narrowly accommodates religious practice, Plaintiff suggests that RIDOC could specify a

single color and style of crocheted (that is, see-through) kufi that is seamless and tightly fits the

head, which happens to be the style that is already available in the RIDOC commissary.[17]

Relatedly, at the hearing, he acknowledged that the ban on all head-coverings could persist for

visits with outsiders or gatherings of prisoners, such as for classes, but that, in the prison yard

where secular hats are already worn, it makes no sense.  See Pl. Dec. II ¶¶ 12, 14; Compl. ¶¶ 22-

23.  Consistent with cases like Ajala and Caruso, he points out that allowing the kufi in the yard

would not increase the risk because the secular caps already allowed in the yard can be tilted to

signify gang affiliation.  Compl. ¶¶ 22-23; Pl. Dec. II ¶¶ 13-14.  Plaintiff debunks the notion that

a more relaxed kufi policy would heighten religious tension because inmates already know well

which prisoners are Muslim as a result of their special diet and attendance at religious services,

yet they "have not been singled out by anyone."  Pl. Dec. II ¶¶ 26-28.  Plaintiff also claims that

Muslims are taught that they are "better in the eyes of Allah," so that the kufi ban adds nothing to

the prevention of an "us v. them" mentality based on religious belief.  Pl. Dec. II ¶ 29.

　　　In response, RIDOC's affidavits and arguments compellingly establish that the headwear

policy is part of a larger solution to an array of important penological concerns, fueled by a past

when the ACI was plagued by serious and dangerous gang activity and based on RIDOC's

judgment as to what was needed to form an integrated set of protocols calibrated to address

---

[17] Plaintiff presents an array of reasons why this suggestion presents a less restrictive means of furthering RIDOC's goals without compromising safety or security.  For example, he points out that the increased risk of contraband is minimized by limiting inmates to a see-through crocheted kufi that hugs the skull.  Compl. ¶¶ 24, 27; Pl. Dec. II ¶¶ 11-12.  Such a kufi style also eliminates the ability of an inmate to hide his face to evade identification.  Compl. ¶ 26.  The risk of gang signaling is reduced by a permitting a single style of kufi available in limited colors with no seam to prevent turning the seam in a certain direction as a gang signal.  See Aceto Aff. ¶ 35.

anticipated safety risks.  While RIDOC readily concedes that none of its policies are perfect at eliminating the risks they are designed to address, they do not appear to be based on mere speculation or on what <u>Holt</u> condemned as the "classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions." 135 S. Ct. at 866 (quoting <u>Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal</u>, 546 U.S. 418, 436 (2006)).[18]  Further, generously read, RIDOC's explanation that its policy was adopted in part to address a Rhode Island-specific gang problem permits the Court to infer that it can meet the <u>Holt</u> requirement that the prison must offer reasons why the more lenient federal policy might not work at the ACI.  135 S. Ct. at 866.

However, RIDOC has failed to comply with <u>Holt</u>'s other mandate, <u>see</u> 135 S. Ct. at 864-65, 868, that the prison must address the inmate's suggestion for a less restrictive alternative.  Specifically, RIDOC has failed to present creditable reasons why Plaintiff's suggestion that the wearing of a kufi in the design already offered in RIDOC's commissary at least while exercising in the yard is not workable.  RIDOC asserts only that a kufi can be tipped or worn sporadically as a gang signal and that it would identify Plaintiff as a Muslim.  The first justification fails because the kufi would create no more risk of gang signaling than that posed by the stocking and baseball caps already worn in the yard.  <u>See Holt</u> 135 S. Ct. at 864-66 (½ inch beard proposed by claimant as compromise would be no more difficult to search than ¼ inch beard already permitted).  Likewise, RIDOC has offered no concrete reason why the identification of Plaintiff as a Muslim in the prison yard would increase sectarian tension.  While it has established that an inmate's

---

[18] Even RIDOC's stated reason that it has not altered the headwear policy to allow the kufi partly due to its fear that allowing the kufi would force it to make many other exceptions to its dress code is based on more than pure speculation.  As part of his factual proffer, Plaintiff has offered evidence that the Muslim faith also calls for the wearing of a loose gown or long flowing tunic.  Compl. Exs. E, G.  While he has not asked for the right to wear such garb, this evidence seems to be presented in support not just of the right to wear the kufi more openly but in support of a flexible prison dress code that would utterly eradicate RIDOC's policy of uniformity of dress.

outburst was triggered by his mistaken perception that his meal was adversely affected by a religious accommodation of Muslims, RIDOC has presented no facts suggesting that the wearing of the kufi in the yard by a known Muslim around prisoners of other faiths, who are not adversely affected because they are free to wear stocking caps or baseball caps, would result in harassment or a physical altercation.  See Ajala, 106 F. Supp. 3d at 986 ("defendants have offered nothing but their own say so for believing that the mere sight of a kufi to non-Muslins would be so offensive as to cause a fight") (citing Holt 135 S. Ct. at 867 (Sotomayor, J., concurring)).  Thus, RIDOC's reasons do not hold up to the level of judicial scrutiny required by Holt.  Id. at 864; Staples v. N.H. State Prison, 2015 WL 4067139, at *3 (courts must not defer blindly to the prison's stated security justification).  To the contrary, RIDOC's policy of permitting the carrying of a uniform stocking cap or baseball cap to the exercise yard and the wearing of that uniform cap while exercising is powerful evidence that banning a uniform kufi in the same setting and under the same circumstances is not the least restrictive alternative.  Ajala, 106 F. Supp. 3d at 984 (evidence that prisoners allowed secular baseball caps raises issues regarding kufi ban in same circumstances); Ali, 69 F. Supp. 3d at 644 (claim that kufi is security risk undermined by evidence that prisoners may wear caps); Caruso, 2005 WL 5957978, at *20 (kufi ban is not least restrictive means where prisoners allowed to wear secular stocking caps and baseball caps anywhere in prison).

Based on foregoing, I find that Plaintiff has sustained his burden of demonstrating that he is likely to succeed on the merits to the limited extent that RIDOC has failed to establish that its ban on a uniform kufi, designed to minimize identified risks and worn only at the same times and with the same limits as are applicable to the wearing of secular caps, is the least restrictive means of furthering RIDOC's important interests in safety and security.

### B.       Balancing of Harms and Public Policy

The remaining factors that the Court must consider in determining whether interim injunctive relief is appropriate are the risk of irreparable harm to the party seeking the injunction, as balanced against the harm to the party opposing it, and the public policy interests implicated by the issuance (or not) of an injunction.  Winter v. NRDC, Inc., 555 U.S. 7, 20 (2008); Nieves-Marquez, 353 F.3d at 120.  The starting point for the analysis is that the loss of religious freedom caused by a RLUIPA violation – standing alone – is sufficient to show irreparable harm and that the protection of religious practice is an important public interest.  Staples v. Gerry, Civil No. 14-cv-473-JL, 2015 U.S. Dist. LEXIS 86629, at *44, 47-48 (D.N.H. May 11, 2015) (citing cases), adopted with modifications sub nom., Staples v. N.H. State Prison, 2015 WL 4067139.

In this case, Plaintiff has enhanced his showing of irreparable harm with his averment that he experienced severe anxiety when he felt forced to choose his religious practice over leaving his cell, including for outdoor recreation.  See id. at 44-45 (irreparable harm shown by proof that prisoner forced to remain in high security confinement to avoid shaving beard).  Diluting the irreparability of Plaintiff's harm is his seven-year delay in initiating this challenge.  While Plaintiff argues that the delay should be disregarded based on his claimed lack of understanding of the law, the case law is clear that even *pro se* plaintiffs are expected to know their legal rights.  See Laurence v. Wall, No. 07-066ML, 2007 WL 1875795, at *1 (D.R.I. June 27, 2008).  The irreparability of the harm is also reduced by the reality that Plaintiff can wear the kufi except for the few hours he is allowed out of his cell each day; therefore, the headwear policy has limited impact on him due to his high security status.[19]

---

[19] Because the PLRA only permits a ninety-day preliminary injunction unless there is further fact finding by the court, 18 U.S.C. § 3626(a)(1-2), Plaintiff's suggestion that he might be allowed out of his cell more in the future is less pertinent to this analysis.

Balanced against these considerations is RIDOC's strong showing that its headwear policy is in furtherance of a compelling public interest in prison safety and security.   The affidavits of RIDOC's two high ranking officers, Lieutenant Galligan and Deputy Warden Aceto, establish their belief based on years of correctional experience that the elimination of the headwear policy would create a more dangerous prison environment.  See Letourneau v. Aul, 2015 WL 5167854, at *2 (balance of harms weighs against inmate asserting RLUIPA claim where there is "no basis to intrude on the inner workings of the ACI, a subject area that requires strong deference by this Court").  These affidavits also establish that a broad interim injunction could have collateral consequences that RIDOC would have to address in recalibrating its carefully interrelated mesh of policies to comply with the injunction while trying to operate a safe prison with appropriate rules affecting other inmates.  Further, to the extent that RIDOC might initiate an evaluation of the headwear policy in light of the experiences of other prison systems, its timetable for doing so in an orderly fashion could be adversely impacted.

In tallying the relative harms, the Court must comply with the PLRA requirement that consideration of an interim injunction affecting prison policy requires giving "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief," as well as affording respect for principles of state and federal comity.  18 U.S.C. § 3626(a)(2); see Morales Feliciano, 378 F.3d at 50 (§3626 requires courts to be guided by "ambient intent" to curb involvement of judiciary in day-to-day management of prisons); Collins v. Magnuson, No. Civ. 03-82-B-W, 2003 WL 23004996, at *2 (D. Me. Dec. 19, 2003) (interim injunctive relief denied where "record, at this juncture, indicates" that plaintiff failed to demonstrate he will "more likely than not succeed on the merits," and equities, viewed with "the caution of 18 U.S.C. § 3626(a)(2) in mind" do not support injunction) (emphasis in original).

Guided by these principles, I find that, except for the narrow circumstances of the prison yard where secular caps are already allowed, the balance of the hardships tilts dramatically against the issuance of an injunction. Similarly, in that narrow context, I find that the public interest in protecting religious practice predominates because the increased risk to safety and security is small; otherwise the public interest requires the denial of an injunction that broadly alters the headwear policy. See Staples v. Gerry, 2015 U.S. Dist. LEXIS 86629, at *47-48 (public interest served by narrow injunction tailored to protect religious practice).

### C. Scope of Narrow Interim Injunction

RIDOC has raised legitimate security concerns that counsel against the entry of preliminary injunctive relief that would require RIDOC to dramatically change its headwear policy before this case is resolved on the merits. Mindful that this Court "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them," Overton v. Bazzetta, 539 U.S. 126, 132 (2003), but also that, "if a less restrictive means is available for the Government to achieve its goals, the Government must use it," Holt, 135 S. Ct. at 864 (quoting United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 815 (2000)), I recommend that Plaintiff's motions for a temporary restraining order and preliminary injunction be granted by the issuance of a ninety-day limited injunction, as required by 18 U.S.C. § 3626(a)(1-2), directing that, beginning thirty days after this Court adopts my recommendation, RIDOC shall permit Plaintiff to wear a uniform, close-fitted, seamless, crocheted kufi, of a single color, only while exercising in the prison yard, subject to all of RIDOC's limits on the wearing of secular head coverings and subject to the withdrawal of the privilege if the wearing of the kufi implicates any of RIDOC's

26

identified security concerns.  Otherwise, I recommend that the motions be denied.  See Robinson v. Wall, 2013 WL 4039027, at *2 (mandatory preliminary injunction that alters rather than preserves status quo should issue only if facts and law clearly favor the moving party).

I note that the proviso permitting RIDOC to withdraw the privilege is included partly in light of the troubling evidence of Plaintiff's history of involvement with contraband smuggling and his former participation in gang-related activities.  Holt, 135 S. Ct. at 867 (institution may withdraw accommodation of claimant who abuses exemption so as to undermine prison's compelling interest).  Further, where RIDOC's compelling interest in safety would be triggered not just by Plaintiff's use of the kufi to smuggle contraband, inflame sectarian tension or give gang signals, but also by increased tensions arising from the perception of other inmates that Muslims have been unfairly singled out for preferential treatment, any such concrete increase in sectarian tensions caused by this limited injunction may also be grounds for terminating Plaintiff's right to wear the kufi unless and until the increased risk can be addressed and resolved.  Put differently, even if Plaintiff's conduct is pristine, if the kufi worn in the yard raises tension and creates the risk of violence, RIDOC may reinstitute its ban.  See Staples v. N.H. State Prison, 2015 WL 4067139, at *9 (modifying limited interim injunction to make clear that prison may take either punitive or protective action in response to actual security threat).  And the delay in the implementation of this interim injunction for thirty days following this Court's adoption of this recommendation is included to allow RIDOC time to adjust its policies, regulations and search protocols.  Caruso, 2005 WL 5957978, at *21 (mindful of deference due to prison officials, court enjoins violation but leaves to officials to fashion remedy based on alternatives mentioned in opinion); Fisher v. Goord, 981 F. Supp. 140, 177 (W.D.N.Y. 1997) (even where there has been merits finding that unconstitutional conditions exist, federal courts

should proceed cautiously and incrementally in ordering remediation so as not to assume the role of prison administrators).

I add a coda to address RIDOC's fear that an interim injunction in this case would cause it to be inundated with demands for various forms of religious garb. The limited interim injunction that I am recommending is consistent with a policy that is strictly limited to (a) religious headwear for which RIDOC has established a uniform standard; (b) headwear appropriate to be worn while exercising; and (c) headwear that covers no more of the head, face or body than is covered by the secular stocking and baseball caps already permitted. It is not consistent with more.

IV.    **CONCLUSION**

Based on the foregoing, I recommend that Plaintiff's motions for a temporary restraining order and preliminary injunction be granted by the issuance of a ninety-day limited injunction directing defendant A.T. Wall in his official capacity as the Director of the Rhode Island Department of Corrections (not in his individual capacity) to alter its headwear policy to permit Plaintiff to wear a uniform close-fitted, seamless, crocheted kufi, available in only one color, only while exercising in the prison yard, subject to all of the limits on the wearing and use of secular head coverings and subject to the withdrawal of the privilege if the wearing of the kufi concretely implicates any of RIDOC's identified security concerns. Otherwise, I recommend that the motions be denied. I further recommend that the implementation of this interim injunction be stayed until thirty days following this Court's adoption of this recommendation to allow RIDOC time to adjust its policies, regulations or search protocols.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting

party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a

timely manner constitutes waiver of the right to review by the district judge and the right to

appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008);

Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
August 15, 2016